# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

AARON M.[1],

               Plaintiff,

v.

ANDREW SAUL,
Commissioner of Social Security,

               Defendant.

Case No. 4:20-cv-00009-SLG

## DECISION AND ORDER

On or about October 22, 2017, Aaron M. ("Plaintiff") filed an application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning July 2, 2015.[3] Plaintiff has exhausted his administrative remedies and filed a Complaint seeking relief from this Court.[4] Plaintiff filed his opening

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brought claims under Title II only. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 13, 218. The application cites October 27, 2017 as the application date. A.R. 218. Plaintiff amended his application, informing the SSA that he received workers' compensation, public disability, or black lung benefits until March 1, 2017. A.R. 220–21.

[4] Docket 1 (Plaintiff's Compl.).

brief on August 26, 2020, seeking a remand for an award of benefits or alternatively, further proceedings.[5]   The Commissioner filed a brief asserting that the Court should affirm the ALJ's decision.[6]   Plaintiff filed his reply on September 28, 2020.[7]   Oral argument was not requested and was not necessary to the Court's decision.   This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8]   For the reasons set forth below, Plaintiff's request for relief will be denied.

## I.   STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]   Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11]   In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts

---

[5] Dockets 12, 13 (Plaintiff's Br.).

[6] Docket 14 (Defendant's Br.).

[7] Docket 15 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[14]  An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15]  Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16]  In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[17]

## II.    DETERMINING DISABILITY

The Social Security Act (the Act) provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (*superseded in part by statute on other grounds,* § 404.1529) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

physical or mental disability.[18]  In addition, Supplemental Security Income (SSI) may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23]  If a claimant establishes a

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

prima facie case, the burden of proof then shifts to the agency at step five.[24]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity."[26]  *The ALJ determined that Plaintiff engaged in substantial gainful activity from July 2, 2015, the alleged onset date, through October 28, 2017.  However, the ALJ noted that there was "a continuous 12-month period during which [Plaintiff] did not engage in substantial gainful activity" and addressed the period Plaintiff did not engage in substantial gainful activity.[27]*

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[28]  *The ALJ determined that Plaintiff had the following severe impairments: status-post right wrist surgeries; lumbar spine spondylosis, status-post lumbar surgery; right hip impingement with labrum tear, status-post right hip*

---

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[27] A.R. 15–16.

[28] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

*arthroplasty; small right shoulder labral tear; right knee chondromalacia; left shoulder labral tear; and moderate acromioclavicular joint degenerative disease with impingement.*[29]

**Step 3.**  Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.[30]  *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.*[31]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[32] *The ALJ determined that Plaintiff had the residual functional capacity to perform light work except for the following limitations: standing or walking for a total of three hours and sitting for a total of seven hours in an eight-hour workday with normal breaks; frequent right*

---

[29] A.R. 16.

[30] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[31] A.R. 17.

[32] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

*pushing/pulling; occasional climbing of ramps or stairs; occasional stooping, kneeling,*

*crouching, and crawling; no climbing of ladders, ropes, and scaffolds; frequent balancing;*

*frequent reaching overhead on the right; avoiding all unprotected heights; and avoiding*

*concentrated exposure to operational control of moving machinery and hazardous*

*machinery.*[33]

**Step 4.** Determine whether the claimant is capable of performing past relevant

work. At this point, the analysis considers whether past relevant work requires the

performance of work-related activities that are precluded by the claimant's RFC. If the

claimant can still do his past relevant work, the claimant is deemed not to be disabled.[34]

Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined*

*that Plaintiff was capable of performing his past relevant work as a shipping and receiving*

*supervisor and a basics logistics officer.*[35]

**Step 5.** Determine whether the claimant is able to perform other work in the

national economy in view of his age, education, and work experience, and in light of the

RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled.[36] *The*

*ALJ determined that although Plaintiff was capable of performing past relevant work,*

---

[33] A.R. 17.

[34] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[35] A.R. 22.

[36] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

*other jobs existed in the national economy that he was also able to perform, including*

*assembler, ticket taker, and parking lot attendant.*[37]

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social

Security Act at any time from July 2, 2015, through the date of the ALJ's decision.[38]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1978.[39]  Although Plaintiff alleged an onset date of July 2,

2015, Plaintiff reported working until October 28, 2017.[40]  He reported last working in the

parts and service department of a construction machinery business.  In the past, he

reported working as a logistics advisor and shipping and receiving supervisor for

government contractors, after serving in the United States Army.[41]  On or about April 12,

2018, the Social Security Administration ("SSA") initially determined that Plaintiff was not

disabled under the applicable rules.[42]  On May 7, 2019, two medical examiners first

testified at a hearing before ALJ Cecelia LaCara.  Plaintiff then testified, with

representation, at the hearing.[43]  The ALJ issued an unfavorable ruling on July 2, 2019.[44]

---

[37] A.R. 23–24.

[38] A.R. 24.

[39] A.R. 218.

[40] A.R. 15–16, 231.  The ALJ determined that Plaintiff engaged in substantial gainful activity from July 2, 2015 through October 28, 2017.  The ALJ noted, "[a]lthough the [Plaintiff] reported that his work was subsidized by his employer, the evidence of record does not support such."  A.R. 16.

[41] A.R. 60–66, 231–36.

[42] A.R. 96.

[43] A.R. 58–73.

[44] A.R. 10–24.

The Appeals Council denied Plaintiff's request for review on January 24, 2020.[45]  On March 13, 2020, Plaintiff filed his Complaint; he is represented by counsel in this appeal.[46]

*Medical Records and Medical Opinion Evidence*

The Court's summary of the medical evidence focuses on the time period after October 28, 2017.[47]  However, the following are the relevant records before October 28, 2017:[48]

On or about July 17, 2015, Plaintiff saw Matthew Raymond, D.O., at Fairbanks Urgent Care, for a right wrist injury.  Plaintiff reported injuring his right wrist on July 2, 2015 at work, while lifting a 60-pound piece of steel.  Dr. Raymond limited Plaintiff to lifting no more than 5 pounds and recommended using a splint at work.[49]  On July 27, 2015, Dr. Raymond recommended physical therapy for two weeks.[50]  On August 11 and August 20, 2015, Dr. Raymond opined that Plaintiff could return to work without restrictions.[51]

On August 19, 2015, Plaintiff saw Jedidiah Malan, M.D., for a right wrist MR arthrogram.  Some tearing of the wrist ligaments was noted.[52]

---

[45] A.R. 1–5.

[46] Docket 1.

[47] Plaintiff performed substantial gainful activity from July 2, 2015 to October 28, 2017.  A.R. 15–16.

[48] The Court's record contains duplicates of certain medical records.  Whenever possible, the Court cites to the first record number.

[49] A.R. 581, 586.

[50] A.R. 588.

[51] A.R. 598, 605.

[52] A.R. 607–08.

On October 19, 2015, Plaintiff underwent right wrist arthroscopy, arthroscopic debridement of central triangular fibrocartilage tear, and an assisted triangular fibrocartilage repair, and a partial synovectomy of the right wrist.[53]  Post-operatively, Dr. Wagner opined that Plaintiff was "totally incapacitated" and would be re-evaluated on November 3, 2015.[54]

From approximately November 25, 2015 through February 4, 2016, Plaintiff participated in physical therapy sessions for right wrist pain.[55]  On February 4, 2016, Plaintiff reported being "cleared for light duty at work including occasional lifting up to 16 pounds."[56]

On March 25, 2016, Plaintiff followed up with Dr. Wagner.  He reported that he was making progress, but that his wrist did flare up at times.  Post-operatively, Dr. Wagner opined that Plaintiff would be released for full duty work on or about May 1, 2016.[57]

On May 21, 2016, Plaintiff saw Eric Hofmeister, M.D., for an independent hand specialist examination.  Dr. Hofmeister opined that a right wrist radial carpal steroid injection was an appropriate treatment and that Plaintiff would reach medical stability in two months.  He recommended Plaintiff wear a wrist brace "when performing heavy activities."[58]

---

[53] A.R. 636, 663–64.

[54] A.R. 662.

[55] A.R. 616–17, 619, 621–32.

[56] A.R. 631.

[57] A.R. 879.

[58] A.R. 633–40, 649–55.

On June 30, 2016, Plaintiff initiated care with Michael McNamara, M.D., at Alaska Hand-Elbow-Shoulder Surgical Specialists. Dr. McNamara recommended nerve conduction and velocity studies of the hand and discussed possible surgery.[59] On the same date, Plaintiff had an MR arthrogram of the right wrist. It showed an abnormally increased scapholunate distance and a torn ligament; an intact lunotriquetral ligament; an avulsion of the TFCC from the radial attachment site; an old avulsion of the ulnar styloid with nonunion or fibrous union; no acute fractures; no aseptic necrosis; and a marked radiocarpal joint space narrowing, with loss of cartilage at the articulation of the radius with the ulnar bone.[60]

On July 18, 2016, Plaintiff saw James Foelsch, M.D., for electrophysiology for right hand numbness. Dr. Foelsch noted that Plaintiff's nerve conduction studies of the right upper extremity were normal.[61]

On August 31, 2016, Plaintiff underwent right wrist surgery.[62] Dr. McNamara opined that Plaintiff would be unable to return to work for two weeks.[63]

On September 12, 2016, Dr. McNamara released Plaintiff to light and limited duty work.[64]

---

[59] A.R. 694–95.

[60] A.R. 677.

[61] A.R. 747.

[62] A.R. 705–06.

[63] A.R. 669.

[64] A.R. 670.

Case No. 4:20-cv-00009-SLG
Decision and Order
Page 11 of 50

On October 3, 2016, Plaintiff saw Robert Thomas, PA-C, at Alaska Hand-Elbow-Shoulder Surgical Specialists, for a cast change. Plaintiff reported having "some issues with work," as his workplace wanted Plaintiff to begin doing "some lifting, pulling and pushing." The x-ray showed good alignment and position of the surgical hardware.[65] PA Thomas stated Plaintiff would be unable to return to work for approximately eight weeks.[66]

From approximately September 27, 2016 through October 17, 2016, Plaintiff underwent chiropractic adjustments at Fairbanks Family Wellness. He reported lower back, neck, and right upper arm pain.[67]

On October 25, 2016, Plaintiff followed up with Michael McNamara, M.D., at Alaska Hand-Elbow-Shoulder Surgical Specialists. He reported having numbness and loss of sensation in the thumb and tips of his fingers and swelling. On physical examination, Dr. McNamara observed full range of motion of the digits and good right wrist position. He noted that Plaintiff was off work for eight weeks "because of the heavy requirements of his job."[68]

From approximately October 27, 2016 to December 19, 2016, Plaintiff participated in an occupational therapy program for his wrist. At the end of the program, the occupational therapist requested a medical recommendation. She opined that Plaintiff was "not progressing due to pain."[69]

---

[65] A.R. 390–92.

[66] A.R. 671.

[67] A.R. 299–304, 531–32.

[68] A.R. 394–96.

[69] A.R. 681–82.

On December 12, 2016, Plaintiff saw Peter Jiang, M.D., at Fairbanks Memorial Hospital. He reported low back pain. Dr. Jiang assessed Plaintiff with "lumbar degenerative disk disease with herniation, right paracentrally L5-S1 neuroforaminal narrowing, possibly due to lateral foraminal disk protrusion." On physical examination, Plaintiff had adequate range of motion on flexion, extension, and rotation in the cervical spine area; a symmetrical, 2+ deep tendon reflex in the bilateral upper extremities, patellar, and Achilles; 5/5 motor strength testing of the upper and lower extremities; normal walking; and "no significant antalgic gait." Dr. Jiang performed a right S1 transforaminal epidural steroid injection under fluoroscopy.[70]

From approximately December 19, 2016 to January 30, 2017, Plaintiff participated in an occupational therapy program for his right wrist. The occupational therapist requested a physician's reassessment. She noted, "we have not been able to progress resistive ex[ercises]/use due to pain over S-L interval."[71]

On December 20, 2016, Plaintiff followed up with Dr. McNamara. Dr. McNamara recommended keeping Plaintiff out of work for an additional eight weeks, except for administrative work only.[72]

---

[70] A.R. 316–17.

[71] A.R. 684–85.

[72] A.R. 398–400.

On January 4, 2017, Dr. McNamara completed a questionnaire associated with Plaintiff's workman's compensation claim. He opined that Plaintiff could be released to light duty administrative work only.[73]

On February 2, 2017, Plaintiff followed up with Dr. McNamara. He reported wearing a brace on his wrist, but that the pain and "clicking in the wrist" had worsened. He also reported mild numbness in the wrist and hand. The x-ray of Plaintiff's wrist showed "the Osteomed screw across the scapholunate, in good position on AP, oblique and lateral, centered in the lunate"; "a single Osteomed screw through the ulnar styloid base fracture but there [was] fibrous nonunion, and no evidence of loosening of the wire or the screw but the wire [was] somewhat prominent"; and "a little bit of cystic change against the triquetrum from the wire."[74]

On March 14, 2017, Plaintiff saw PA Thomas for a preoperative examination for right wrist hardware removal.[75] PA Thomas opined that Plaintiff could be released for light duty work with no lifting, pushing, or pulling over five pounds.[76] On March 15, 2017, Plaintiff underwent surgery of the right wrist to remove hardware.[77]

On March 27, 2017, Plaintiff followed up with PA Thomas. He reported that he was sore after surgery, but that he was "no longer taking any type of pain medication."

---

[73] A.R. 676.

[74] A.R. 724–25.

[75] A.R. 726–27.

[76] A.R. 673.

[77] A.R. 732.

PA Thomas opined that Plaintiff should not do "any heavy lifting, pulling or pushing for about 6–8 weeks."[78] PA Thomas also opined that Plaintiff could be released for light duty work with no lifting, pushing, or pulling over 2–3 pounds.[79]On March 29, 2017, Plaintiff followed up with Dr. Jiang. He reported that his last S1 injection resulted in 4 months of consistent pain relief with no side effects. On physical examination, Plaintiff had adequate range of motion in the cervical spine; normal deep tendon reflexes in the bilateral upper extremities, patellar, and Achilles; normal heel to toe walking; and he arose from a seated position easily with "no significant antalgic gait." Dr. Jiang performed a right S1 transforaminal epidural steroid injection under fluoroscopy.[80]

On May 16, 2017, Plaintiff followed up with Dr. McNamara. He reported grinding and clicking in his right wrist. Dr. McNamara opined that Plaintiff was "doing well" and recommended continuing "two more months of light duty status, no lifting greater than 15 pounds and minimiz[ing] torqu[e]ing, wear[ing] a splint if he needs to, and we will see him back in about two months to determine when the screw needs to be removed and across the scapholunate."[81] The x-ray of Plaintiff's wrist showed "good alignment of the scapholunate on the lateral, screw across the middle aspect of the lunate"; "some mild flexion of the scaphoid on the AP but good position of the screw, and probably a fibrous

---

[78] A.R. 733–34.

[79] A.R. 674.

[80] A.R. 323–24.

[81] A.R. 417–19.

Case 4:20-cv-00009-SLG   Document 16   Filed 04/06/21   Page 15 of 50

nonunion of the ulnar styloid with a single Osteomed screw that does not appear to be loose."[82]

On May 30, 2017, Plaintiff saw Steven Rast, PA, , at Anchorage VA Medical Center. He reported pain that radiated from the neck to the scalp causing recurrent headaches and lower back pain radiating to the right hip and upper leg. Deborah Fox, RN, completed an addendum providing MRI results. The MRI showed right central and foraminal disc protrusion at L5-S1 with displacement of right S1 nerve root.[83]

On July 18, 2017, Plaintiff followed up with Dr. McNamara. He reported that his wrist had "not really improved since [his] last visit." Dr. McNamara assessed Plaintiff with "right complex wrist." He opined that Plaintiff may have severe carpal tunnel; symptoms at his ulnar styloid nonunion; and some intermittent symptoms dorsal radial, unclear etiology.[84] Dr. McNamara ordered a nerve conduction study, the results of which were normal.[85]

On July 19, 2017, Plaintiff had an MRI of the cervical spine. The MRI showed a "[b]road-based central disc protrusion at C6-7 more apparent than prior study, without significant stenosis" and "multilevel mild disc osteophyte complex at other levels without significant stenosis."[86] On the same date, Plaintiff had an MRI of the lumbar spine. The

---

[82] A.R. 738.

[83] A.R. 479–80.

[84] A.R. 421–23, 742.

[85] A.R. 747.

[86] A.R. 518–19.

MRI showed a right central and foraminal disc protrusion at L5-S1 with displacement of the right S1 nerve root.[87]

On August 1, 2017, Plaintiff followed up with Dr. Jiang for treatment of low back pain. Dr. Jiang noted that Plaintiff's recent MRI corroborated his assessment of lumbar disc herniation at L5-S1 with a right paracentral disk bulge. Plaintiff reported having pain relief for three months after his last SI injection and otherwise took no significant pain medications. On physical examination, Dr. Jiang observed adequate range of motion in the cervical spine; normal deep tendon reflexes in the bilateral upper extremities, patellar, and Achilles; normal heel to toe walking; and he arose from a seated position easily with no significant antalgic gait. Dr. Jiang performed a right S1 transforaminal epidural steroid injection under fluoroscopy.[88]

On September 25, 2017, Plaintiff saw Ralph Purcell, M.D., an orthopedic/hand surgeon, for an independent medical examination. Dr. Purcell reviewed Plaintiff's medical records to date and conducted an interview and physical examination. Plaintiff reported burning, numbness, aching, and stabbing pain in the right wrist with a pain level of six out of ten. He also reported right shoulder pain for a year prior to the examination and ongoing weakness in his right fourth finger. Plaintiff reported chronic low back pain, status post spine surgery; chronic neck pain without radicular symptoms; and reported taking tramadol, 400mg to 800mg of ibuprofen for five out of seven days, and two to three Tylenol extra strength one to two days per week. He reported that at the time of the

---

[87] A.R. 520–21.

[88] A.R. 338–39, 345.

examination, he was "involved with parts and service and maintenance." He described working on excavators for gold mines in the past, using forklifts at work, and that, on occasion at work, he "has to hand lift as well and that requires lifting, pushing, and pulling up to 700 pounds at a time." Plaintiff reported that he had been doing this type of work since 2011. He also reported that although his job description was changed to "light work" after his second wrist surgery, he was "doing the same job he was doing when he was on full duty," but tried to avoid heavy work and did computer work instead. Dr. Purcell opined that Plaintiff's triangular fibrocartilage complex tear had healed; that Plaintiff had "clinical findings consistent with right carpal tunnel syndrome" and would benefit from a cortisone injection or surgery. He also opined that Plaintiff's ulnar nerve neuritis would "likely resolve over time without additional treatment"; that occupational therapy or surgery was needed to reach medical stability with regard to the radially based peripheral triangular fibrocartilage complex tear; and that Plaintiff's ulnar styloid nonunion did not require any additional treatment. Dr. Purcell opined that Plaintiff had "no physical restrictions that I would impose for [Plaintiff] due to his diagnosed conditions other than avoidance of repetitive or prolonged wrist motion or wrist positioning with regard to the carpal tunnel syndrome." He recommended avoiding "very heavy categories of work."[89]

On October 5, 2017, Plaintiff saw Audrey Kelley, PA-C, at Anchorage Neurosurgical Associates, Inc. He reported low back pain, neck pain, and headaches. Plaintiff also reported having four low back injections, with each subsequent injection providing relief for a shorter duration. On physical examination, PA Kelley observed

---

[89] A.R. 752–73.

normal muscle bulk and tone; 5/5 strength in the upper and lower extremities; normal reflexes, sensory, coordination, gait, and stance; and a positive bilateral straight leg raise for increased pain on the right. PA Kelley noted that Dr. Kralick believed it was "reasonable to proceed with a right L5-S1 laminotomy for excision of disc and decompression of the right S1 nerve root."[90]

The following are the relevant records after October 28, 2017:

On November 15, 2017, Plaintiff saw Nancy Cross, M.D., at Integrative Pain Center of Alaska. He reported chronic pain for the past 16 years. He reported pain in his head, neck, right shoulder, right wrist, right hand, and lower back and reported that the pain interfered severely with his daily activities. Dr. Cross observed a decreased range of motion in the cervical and lumbar spine; normal walking on heels and toes and heel to toe without difficulties; normal motor strength except in the right due to surgery; normal reflexes; and decreased sensory in the right hand "due to previous surgery." Dr. Cross noted that "[a] screening of somatic concerns reflects a significant somatic preoccupation while moderate level of depression as indicated on Zung depression inventory" and that Plaintiff "would benefit from the services of health psychology, to address pain and somatization, as well as manage depressive symptoms." Dr. Cross assessed Plaintiff with neck pain due to C5-6 degeneration and occipital neuralgia. Dr. Cross diagnosed Plaintiff with displacement of lumbar spine; depressive disorder; lumbosacral spondylosis; displacement of cervical spine; and cervical syndrome.[91]

---

[90] A.R. 434–37.

[91] A.R. 367–76.

Case No. 4:20-cv-00009-SLG
Decision and Order
Page 19 of 50

On December 5, 2017, Plaintiff followed up with Dr. Cross. He reported headache symptoms. Dr. Cross performed a greater occipital nerve block.[92]

On January 2, 2018, Plaintiff presented to the emergency room in Kona, Hawaii, for a right wrist injury. He reported being struck by a wave attempting to break a fall with his hand. The attending physician opined that Plaintiff had a soft tissue injury to the wrist with possible loosening of surgical hardware.[93]

On January 9, 2018, Plaintiff followed up with PA Thomas. He reported reinjuring his right wrist while in Hawaii. PA Thomas assessed Plaintiff with right wrist pain with a "possible new injury to the scapholunate ligament and probable right sided cervical radiculopathy." Plaintiff reported that he had been scheduled for surgery in November 2017, but "because he was controverted by Worker's Compensation it was canceled." He reported that he was covered by the VA and could move forward with right wrist surgery. The x-ray of Plaintiff's right wrist showed an established nonunion but no loosening of the screw.[94] On the same date, Plaintiff saw Jennifer Hermanson, PA-C, at Anchorage Neurosurgical Associates, Inc. Plaintiff reported low back pain into his right hip/groin and down the posterior thigh to the knee. He reported right leg weakness due to pain; occasional numbness and tingling throughout the right leg; and muscle spasms in his low back. On physical examination, Plaintiff had 5/5 strength in the upper and lower extremities; displayed diminished sensation to light touch throughout the entire left lower

_____

[92] A.R. 377–80.

[93] A.R. 382–87.

[94] A.R. 425–27.

extremity; had a normal gait; was able to stand without difficulty; and could heel-toe-walk without difficulty.[95]

On January 10, 2018, Plaintiff underwent a right L5-S1 laminotomy, medial facetectomy, disc excision, and nerve root decompression.[96]

On February 8, 2018, Plaintiff followed up with Dr. McNamara. He reported that his right wrist still bothered him with mainly ulnar soreness after his fall in January 2018, but that swelling had subsided and the wrist felt stronger. Dr. McNamara noted that Plaintiff's wrist nerve studies were "completely normal" and reported the numbness and tingling in his fingers was resolving. Dr. McNamara assessed Plaintiff with left upper extremity wrist pain; mild widening of the scapholunate; and improving, nonoperative carpal tunnel syndrome.[97]

On February 20, 2018, Plaintiff saw Kacie Tempel, PA-C, at Anchorage Neurosurgical Associates, Inc., for follow up after undergoing a right L5-S1 laminotomy on January 10, 2018. He reported lower back and neck pain as well as "nerve pain" focused in his right hip and buttock. In addition, he reported numbness, muscle spasm, vision changes, headaches, and dizziness. On physical examination, Plaintiff had 5/5 muscle strength in the upper and lower extremities; a normal gait, stance, and ability to stand without difficulty; no limitations in range of motion; paraspinal muscle spasms in the

---

[95] A.R. 431–33.

[96] A.R. 494–95.

[97] A.R. 428–30.

neck; no tenderness to palpation of the cervical or lumbar spine; and intact sensation. PA Tempel recommended physical therapy to treat his lower back pain.[98]

On March 14, 2018, Plaintiff followed up with Dr. Jiang. He reported that the previous cervical epidural injections resulted in two months of relief from his cervical spine symptoms. He reported some back and groin pain after laminectomy surgery at L5-S1. He also reported that the recent occipital nerve block "only probably helped for a couple of weeks." Dr. Jiang assessed Plaintiff with cervical degenerative disk disease, especially bilobular broad based bulging disk at C6-C7. Dr. Jiang recommended an epidural steroid injection, but Plaintiff preferred resuming tramadol and a Medrol pack. Dr. Jiang noted that Plaintiff was on tramadol last year "which was helping with his symptomatology but somehow his refills ran out and he had no side effects to the three a day dosing."[99]

From approximately March 5, 2018 through April 23, 2018, Plaintiff participated in physical therapy for low back pain and neck pain.[100]

On March 22, 2018, Plaintiff underwent a sleep study at the Fairbanks Sleep Center. He was diagnosed with severe obstructive sleep apnea and a CPAP was recommended.[101]

On April 25, 2018, Plaintiff had x-rays of the lumbar spine. The x-rays showed "[n]o significant degenerative change or dynamic instability."[102]

---

[98] A.R. 438–441.

[99] A.R. 942–43.

[100] A.R. 947–991.

[101] A.R. 777–80.

[102] A.R. 916.

On May 21, 2018, Plaintiff saw Dr. Jiang. He reported "good relief" from his prior injection. Dr. Jiang performed a cervical catheter-directed epidural steroid injection under fluoroscopy.[103]

On June 5, 2018, Plaintiff followed up with Kacie Tempel, PA-C, at Anchorage Neurosurgical Associates, Inc. He reported doing well for two weeks after undergoing a right L5-S1 laminotomy and disc excision on January 10, 2018. He also reported increased low back and right hip and buttock pain with occasional muscle spasms in his right leg and low back when standing and sharp, stabbing neck pain radiating into his shoulders and triceps. On physical examination, PA Tempel observed no tenderness of the cervical or lumbar spine; paraspinal muscle spasms in the neck with no limitations in range of motion; 5/5 strength in the upper and lower extremities; decreased sensation over the right C7; a normal gait; and the ability to stand without difficulty.[104]

On June 12, 2018, Plaintiff saw Keira Baird, DPT, for a functional capacity evaluation. DPT Baird found that the "[o]verall test findings, in combination with clinical observations, suggest[ed] the presence of variable levels of physical effort on [Plaintiff's] behalf." She remarked, "[d]espite knowing that testing protocols were timed, client interrupted three different protocols to check his cell phone, go to the bathroom, and get a cup of coffee." DPT Baird also noted that Plaintiff "had a tendency to report high levels of pain that were not consistent with clinical observations," but that Plaintiff's "perceived tolerances when asked about specific body positions or tasks (i.e. standing, sitting, lifting,

---

[103] A.R. 852–54.

[104] A.R. 786–87.

carrying) matched closely to his demonstrated functional tolerances throughout the evaluation." In two chronic pain syndrome questionnaires, Plaintiff's scores indicated that subjectively, Plaintiff's low back pain was crippling and his functional pain caused "great difficulty moving or applying any strength through the painful area." DPT Baird opined that Plaintiff demonstrated "a full Sedentary capacity with some abilities into the Light and Medium range" and "[p]ositional limitations were demonstrated in stooping, squatting, and sustained neck positioning." She also opined that Plaintiff "would be best suited for a job that allow[ed] for frequent postural changes due to his inability to sit for longer than 28 minutes at one time and his inability to stand for longer than 22 minutes at one time during this evaluation."[105]

On June 21, 2018, Plaintiff saw Dr. Jiang for follow up. Plaintiff reported nine days of relief from his last injection targeting the left C7 nerve root.[106]

On June 26, 2018, Plaintiff had an MRI of the lumbar spine. The MRI showed mild lower lumbar L5-S1 laminotomy and microdiscectomy without residual or recurrent disc herniation and mild lower lumbar spondylosis without high-grade canal or foraminal stenosis.[107] Additionally, Plaintiff had an MRI of the cervical spine. The MRI showed mild cervical spondylosis without high-grade canal foraminal stenosis.[108]

---

[105] A.R. 790–813.

[106] A.R. 860–61.

[107] A.R. 1213–14.

[108] A.R. 1215–16.

On July 26, 2018, Plaintiff followed up with PA Tempel. He reported continuing, constant aching neck and shoulder pain, worse on his right side; occasional pain and muscle spasms into his right arm; constant headaches; constant soreness in his low back with radiation into his right hip and leg; numbness in his lateral right leg and foot; and occasional burning sensations in his anterior thighs, right worse than left. He also reported that he did not see improvement in his low back pain with physical therapy. On physical examination, PA Tempel observed 5/5 strength in the upper and lower extremities; a normal gait and ability to stand without difficulty; normal reflexes; and intact sensation to light touch, except over the right C7 dermatome and right lateral thigh and leg. PA Tempel noted that she reviewed Plaintiff's recent MRI and that the MRI did not "show any significant stenosis or degeneration that would require surgical intervention." She recommended facet blocks and RFA "as he does have facet arthropathy on the MRI." PA Tempel also recommended continuing conservative treatments to address Plaintiff's neck pain and low back pain.[109]

On August 9, 2018, Plaintiff saw PA Rast for follow up status post L5-S1 laminotomy and microdiscectomy without residual or recurrent disc herniation. He reported continued soreness in his low back with radiation of pain into the right hip and right leg and numbness in the lateral right leg and foot. He also reported ongoing neck pain with shoulder pain and muscle spasms in the right arm and left knee and ankle pain. On physical examination, PA Rast observed a normal gait and no edema in the upper

---

[109] A.R. 1092–94.

Case 4:20-cv-00009-SLG   Document 16   Filed 04/06/21   Page 25 of 50

extremities.[110]  On the same date, Plaintiff had x-rays of the right hip, left hip, left knee, and left leg.  The x-rays showed no osseous abnormality of the left hip and mild left knee tricompartment osteoarthrosis.  The right hip x-ray showed a "[r]ight hip morphology which may predispose some patients to cam-type femoral acetabular impingement symptoms and no osseous abnormality."[111]

From approximately August 28, 2018 through October 19, 2018, Plaintiff participated in physical therapy for cervicalgia and LBP arthropathy.  On October 19, 2018, Plaintiff "verified that [physical therapy was] not helping" and agreed to a discharge from physical therapy.[112]

On September 4, 2018, Plaintiff saw Joel Marquess, M.D.  Dr. Marquess performed a multiplanar MR arthrogram of the right hip utilizing intra-articular gadolinium.  The arthrogram showed evidence of a right hip acetabular labrum tear.[113]

On September 26, 2018, Plaintiff followed up with Dr. Jiang.  Dr. Jiang performed a right C4-C5 medial branch block.[114]

On October 3, 2018, Plaintiff saw Sean Timmons, PA-C, at Bach Orthopedic Clinic, for chronic right hip pain.  PA Timmons noted that Plaintiff's "exam and imaging studies show evidence of femoral acetabular impingement."  He recommended several treatment

---

[110] A.R. 1250–51.

[111] A.R. 1247–49.

[112] A.R. 1103–17.

[113] A.R. 872–73.

[114] A.R. 1171–72.

options and Plaintiff elected to proceed with an ultrasound guided corticosteroid injection.[115]  On the same date, Plaintiff saw PA Rast for left ankle pain.  PA Rast opined that Plaintiff's left ankle pain was "most likely secondary to change in his routine gait due to a left hip arthropathy."[116]

On October 11, 2018, Plaintiff followed up with Dr. Jiang.   Plaintiff reported experiencing "very minimal relief, 10% to 20%, from the last medial branch block targeting the C4 to C5 facet joint."   On physical examination, Dr. Jiang observed no facet or suboccipital tenderness; adequate range of motion on flexion, extension and rotation on lateral bending of the cervical spine area; symmetrical deep tendon reflexes; 5/5 motor strength of the upper and lower extremities; normal lordosis of the lumbar spine; negative straight leg raising; no significant antalgic gait; normal heel to toe walking; and the ability to rise from the seated position without difficulty.  Dr. Jiang assessed Plaintiff with cervical degenerative disk disease and cervicogenic headache.   He recommended a medial branch block and recommended continuing Plaintiff's prescriptions for pain.[117]

On November 10, 2018, Plaintiff had an MRI of the brain.  The MRI was normal.[118]

---

[115] A.R. 863–66.

[116] A.R. 1234–35.

[117] A.R. 1146–47.

[118] A.R. 528.

On November 13, 2018, Plaintiff followed up PA Timmons. He reported "very good results" with six days of complete relief of pain in the right hip. On physical examination, Plaintiff's strength was 5/5 with no obvious pelvic tilt or gait abnormality.[119]

On December 19, 2018, Plaintiff followed up with PA Timmons to review his CT scan of the bony pelvis. The CT scan showed a "[s]mall intravertebral disc herniation along the L5 inferior endplate" and a small cleft along the superior right acetabulum "which may represent normal variant versus early degeneration."[120]

On January 7, 2019, Plaintiff saw Joseph Lanzi, M.D., at Bach Orthopedic Clinic for right hip pain. On physical examination, Dr. Lanzi observed positive impingement and subspine tests; a positive Stinchfield test; 5/5 strength; and no obvious pelvic tilt or gait abnormality. He assessed Plaintiff with femoral acetabular impingement. Dr. Lanzi noted discussing surgery and nonsurgical options.[121]

On January 11, 2019, Plaintiff underwent right hip arthroscopy, cam decompression, and labral repair.[122]

On January 22, 2019, Plaintiff saw PA Timmons for follow-up after his right hip arthroscopy two weeks prior. He reported wearing a brace and using crutches. PA Timmons noted that Plaintiff had "no other concerns today."[123]

---

[119] A.R. 867.

[120] A.R. 869–71.

[121] A.R. 1479–81, 1585.

[122] A.R. 1545.

[123] A.R. 1521–22.

From approximately January 28, 2019 through March 11, 2019, Plaintiff participated in physical therapy.[124]

On February 5, 2019, Plaintiff initiated care with Mary Ogden, LCSW, at the Anchorage VA Medical Center, Behavioral Health Primary Care. He reported having depression, pain, and mobility issues. LCSW Ogden recommended weekly supportive therapy sessions.[125]

On February 6, 2019, Plaintiff saw PA Rast. He reported bilateral shoulder pain and bilateral knee pain. On physical examination, PA Rast observed a normal gait and upper extremities without edema, cyanosis, inflammation, or petechiae. PA Rast prescribed sertraline 50 mg for depression. PA Rast recommended that Plaintiff "have limited load bearing on [the right] hip until [May 15, 2019]. He is able to do sedentary work activities."[126] On the same date, Plaintiff presented to the emergency department at Fairbanks Memorial Hospital for dizziness and syncope prior to arrival. Plaintiff reported starting Zoloft that day and that he took CBD oil and naproxen regularly for pain. The attending physician recommended stopping Zoloft until after seeing Plaintiff's prescribing physician. The chest CT scan showed no pulmonary embolus. Plaintiff was discharged several hours after arrival.[127]

---

[124] A.R. 1439–53, 1459–77.

[125] A.R. 1230–31.

[126] A.R. 1310–11.

[127] A.R. 1364–1417.

On February 22, 2019, Plaintiff saw PA Timmons at Bach Orthopedic Clinic for follow up after right hip arthroscopy for femoral acetabular impingement and labral repair. He reported some pain and that he used a cane to help him walk. PA Timmons opined that Plaintiff was "doing well overall."[128]

On February 28, 2019, Plaintiff had an MRI of the left knee and left shoulder. The MRI of the left knee showed "[n]o internal derangement." The MRI of the left shoulder showed an anterosuperior through posterosuperior labral tear and moderate AC joint degenerative disease "which might contribute to impingement."[129]

On March 1, 2019, Plaintiff had an MRI of the right knee. The MRI showed "[e]arly tricompartment chondromalacia." It was otherwise a normal right knee MRI. Plaintiff also had an MRI of the right shoulder. The MRI showed a "[s]mall SLAP tear at biceps anchor."[130]

On March 15, 2019, Plaintiff saw LCSW Ogden. She diagnosed Plaintiff with depression. On mental examination, Plaintiff was oriented x3; was alert and oriented and dressed and groomed appropriately; had a euthymic mood and congruent affect, normal and coherent thought processes; and fair insight and judgment.[131]

On March 19, 2019, Plaintiff received a left shoulder injection under fluoroscopy.[132]

---

[128] A.R. 1454.

[129] A.R. 1355–57.

[130] A.R. 1327–31.

[131] A.R. 1223.

[132] A.R. 1302–03.

On March 27, 2019, PA Rast wrote a letter to the Alaska Court System on Plaintiff's behalf. He opined that Plaintiff should be excused from jury duty "due to a medical condition that would make it difficult to sit for prolonged periods."[133]

*Function Reports*

On February 21, 2018, Plaintiff completed a function report. He reported that migraines and tinnitus prevented him from concentrating, required him to often wear sunglasses all day, and prevented him from getting out of bed many days. He also reported that his back/neck bulge/herniated discs and arthritis prevented him feeling fully in his hands and impaired writing, bending, lifting, twisting, sitting, walking, reaching, and standing, "causing nerves to contract and muscles to spasm in the back and neck." Plaintiff reported that his right leg was partially numb and painful with an unhealed nerve; his right wrist injury prevented him from lifting or twisting items weighing eight pounds or more; his carpal tunnel in both wrists added to his numbness; his medications made it difficult to find work, but his pain was too great without medication; shoulder injuries prevented him from lifting heavy items; and a knee injury made walking and standing difficult for long periods. He reported "extreme pain" affected his sleep and woke him up. He reported that his wife helped with his personal care and prepared most meals. Plaintiff reported that he was able to clean the sink and counters and remind his wife to do the chores, but he did not perform other chores. He reported that his wife took him "somewhere to walk" three times per week; his wife drove him places or he took cabs when on medications; he watched his daughter's basketball games with his wife; and

---

[133] A.R. 1423.

Case 4:20-cv-00009-SLG   Document 16   Filed 04/06/21   Page 31 of 50

went shopping with his wife three times per week, using the shopping cart for support. Plaintiff indicated that he could occasionally carry five pounds, but he would often drop things; he could not bend or lean; and could only walk five to eight minutes before needing to rest. He also indicated that he used a cane for walking.[134]

*Hearing Testimony on May 7, 2019*

Plaintiff testified on May 7, 2019, with representation, at a hearing before ALJ Cecelia LaCara. He testified that he lived with his wife and 17-year old daughter; that his wife drove him a couple times a week; he spent most of his time laying down except for doctors' appointments or physical therapy; he had anxiety leaving his home; and that neuralgia kept him in bed three to five days a week. Plaintiff stated that it was "extremely painful to sit more than a couple minutes" and he had "excruciating pain going through my abdomen from the back" every time he had to bend. He indicated that his wife helped with his personal hygiene; he was unable to use his right hand; and was unable to stand or walk without his cane. Plaintiff testified that his right shoulder had been out of socket seven times and that his left side had been "partially out." He testified that he had tried several medications, physical therapy, and pain injections, but felt only about eight days of relief from pain after treatments. He stated that he had syncope about three to four times a month. He testified that he had previously worked in receiving, distribution, and warehousing in the military and as a civilian.[135]

---

[134] A.R. 269–77.

[135] A.R. 58–73.

Case 4:20-cv-00009-SLG   Document 16   Filed 04/06/21   Page 32 of 50

Colette Valette testified as the psychological expert. She opined that Plaintiff had "no medically determinable psychological impairments." She noted one doctor diagnosed Plaintiff with depression in February 2019, but that "one evaluation doesn't make a diagnosis." She also noted that Plaintiff was cooperative and not taking medications for depression at the time of the February 2019 evaluation.[136]

Jack Lebeau, M.D., testified as the medical expert. Dr. Lebeau identified several impairments, including status-post right wrist surgeries; lumbar spine spondylosis, status-post lumbar surgery; right hip impingement with labrum tear, status-post right hip arthroplasty; small right shoulder labral tear; right knee chondromalacia; left shoulder labral tear and moderate acromioclavicular joint degenerative disease with impingement; osteoarthropathy of the cervical spine; carpal tunnel syndrome; and obstructive sleep apnea. Dr. Lebeau opined that Plaintiff did not meet or equal a listing. He called the ALJ's attention to the functional evaluation by DPT Baird in June 2018, noting that during the evaluation, Plaintiff stopped to use the restroom, talked on his cell phone, and interrupted the examination to get a cup of coffee.[137] Dr. Lebeau opined that Plaintiff was limited to standing half an hour at a time for a total of two hours in the course of the day. He limited Plaintiff's walking to 15 minutes at a time for an hour in the course of the day. Regarding Plaintiff's walking and standing limitations, Dr. Lebeau stated, "And I think that's very generous. I think he certainly could be better than that, but I just don't have the evidence." Dr. Lebeau also opined that Plaintiff's RFC should include the following

---

[136] A.R. 38–41.

[137] *See* A.R. 790–813.

limitations: lifting 10 pounds frequently and 20 pounds occasionally; never pushing 50 pounds; reaching overhead on the right frequently and on the left continuously; pushing and pulling frequently on the right and continuously on the left; frequently balancing; occasionally stooping, kneeling, crouching, and crawling; continuously operating a motor vehicle; frequently operating moving mechanical parts; and avoiding unprotected heights.[138]

Daniel LaBrass testified as the vocational expert. Based on the ALJ's first hypothetical,[139] VE LaBrass opined that Plaintiff would be able to perform his past work as a receiving supervisor and basic logistics officer. He opined that Plaintiff would also be able to perform other work, including small parts assembler and parking lot attendant. Based on the ALJ's second hypothetical,[140] VE LaBrass opined that Plaintiff would not be able to work on a full-time basis because "[t]wo extra breaks for a half hour would be

---

[138] A.R. 42–57.

[139] The ALJ's first hypothetical was as follows:

> [L]et's assume now we have an individual the same age, education, work experience, as that of the claimant and who is limited to light work. However, this person can stand or walk for a total of three hours and sit for a total of seven hours in an eight-hour workday with the normal breaks. This person is limited to frequent right, push, pull, the occasional climbing of ramps or stairs, the occasional stooping, kneeling, crouching, and crawling. No climbing of ladders, ropes, or scaffolds and the frequent balancing. This person is limited to right frequent overhead reaching. So no work with tools beyond a frequent level. And this person is to avoid all unprotected heights, and is to avoid concentrated exposure to the operational control of moving machinery and hazardous machinery. A.R. 76.

[140] The ALJ's second hypothetical was as follows:

> [W]hen we're looking at someone the same age, education, and work experience as that of the claimant, and has the residual functional capacity that I listed, however, this person would need to have two extra breaks of 30 minutes each so that this individual could lie down during breaks. A.R. 78.

pretty significant extra break taking" and there were no jobs that would accommodate the need to lie down throughout the day.[141]

## DISCUSSION

Plaintiff seeks reversal and remand "for an outright award of benefits or, in the alternative, further development and analysis under the fourth sentence of 42 U.S.C. § 405(g)."[142]   Plaintiff argues the ALJ: 1) "violated agency policy by having the medical experts testify at the beginning of the administrative hearing" before Plaintiff had testified; 2) erred in her evaluation of Dr. Lebeau's medical opinion; and 3) erred by rejecting the functional capacity evaluation results by DPT Baird.

A.  <u>Expert Testimony</u>

Plaintiff asserts that SSA policy "makes it absolutely clear that a medical expert may not testify without the benefit of hearing the claimant's testimony or a summary of such testimony."[143]   Plaintiff's claim is based on the Social Security Agency's internal policy manual, the Hearings, Appeals, and Litigation Manual ("HALLEX") § I-2-6-70(b), which provides in pertinent part:

The [medical expert] may attend the entire hearing, but this is not required.  If the [medical expert] was not present to hear pertinent testimony, such as testimony regarding the claimant's current medications or sources and types of treatment, the ALJ will summarize the testimony for the [medical expert] on the record.  If additional medical evidence is received at the hearing, the ALJ will provide it to the [medical expert] for review before the [medical expert] testifies.[144]

---

[141] A.R. 73–80.

[142] Docket 13 at 12.

[143] Docket 13 at 5.

[144] HALLEX I-2-6-70(b)(S.S.A.), *available at* 1993 WL 751901.

Case 4:20-cv-00009-SLG   Document 16   Filed 04/06/21   Page 35 of 50

Citing the promulgation of SSR 13-2p, Plaintiff argues that the HALLEX is now binding on the ALJ and legally enforceable by the federal courts.[145] He alleges that the ALJ's reliance on the testimony of experts Dr. Valette and Dr. LeBeau "requires remand for further proceedings."[146]

The Commissioner does not dispute that the medical experts testified prior to the Plaintiff and therefore, the medical experts were unaware of Plaintiff's testimony when they rendered their opinions. Instead, the Commissioner contends that the HALLEX is not binding on ALJs nor legally enforceable by the district court, as SSR 13-2p pertains "to evaluating cases involving drug addiction and alcoholism." The Commissioner also argues that since the publication of SSR 13-2p, "district courts throughout the Ninth Circuit have continued to conclude that the HALLEX is not binding on ALJs and are not legally

---

[145] Docket 13 at 3–6. Social Security Ruling ("SSR") 13-2p, states in pertinent part:

> *15. How should adjudicators consider Federal district and circuit court decisions about DAA?*
> . . .
> a.  General. We require adjudicators at all levels of administrative review to follow agency policy, as set out in the Commissioner's regulations, SSRs, Social Security Acquiescence Rulings (ARs), and other instructions, such as the Program Operations Manual System (POMS), Emergency Messages, and the Hearings, Appeals and Litigation Law manual (HALLEX).

> SSR 13-2p, *available at* 2013 WL 621536, at *15 (Feb. 20, 2013).

[146] Docket 13 at 4. Plaintiff notes in his reply brief that the Appeals Council remanded an ALJ's decision in another case based in part on the ALJ's failure to provide the medical examiners who testified at the hearing the opportunity to hear the claimant's testimony or otherwise receive a summary of claimant's testimony. Docket 15-1 at 3. The Court is not persuaded that an Appeals Council decision in another case requires automatic remand on the basis of HALLEX I-2-70B. Testimony, facts, and circumstances are unique to each case. The Court does not know what occurred at the hearing in the referenced case such as whether drug addiction and/or alcoholism was at issue in that case.

enforceable by federal courts."[147]  In the alternative, the Commissioner argues that "even

if the Court concludes that it can enforce HALLEX § I-2-6-70(b)," Plaintiff "has not shown

how the order of testimony at his hearing resulted in any harm."[148]

In *Roberts* and *Lockwood,* the Ninth Circuit held that the HALLEX was not binding

on the ALJs and was not enforceable by the courts.[149]  Plaintiff argues that since the

promulgation of SSR 13-2p in 2013, the HALLEX is binding on the ALJ as a matter of

SSA policy.[150]  However, SSR 13-2p is not applicable to the facts of Plaintiff's case.  SSR

13-2p is a policy clarifying how the SSA determines "whether 'drug addiction and

alcoholism' (DAA) is material to [SSA's] determination of disability."[151]  As other district

courts in the Ninth Circuit have held, SSR 13-2 is not binding here because Plaintiff is not

claiming the ALJ improperly applied the drug and alcohol dependence factors.[152]  And,

---

[147] Docket 14 at 3 (citing *James v. Saul,* No. 19-cv-5881-KS, *available at* 2020 WL 349165, at *10 (C.D. Cal. June 25, 2020); *Ashlock v. Colvin,* No. 3:15-cv-05767-DWC, *available at* 2016 WL 3438490, *5 fn. 2 (W.D. Wash., June 22, 2016)).

[148] Docket 14 at 4.

[149] *See Roberts v. Comm'r of Soc. Sec. Admin.,* 644 F.3d 931, 933 (9th Cir. 2011) ("HALLEX . . . does not carry the force of law and is not binding upon the agency.  Therefore, we do not review allegations of non-compliance with its provisions.") (internal quotations and citations omitted); *Lockwood v. Comm'r Soc. Sec.,* 616 F.3d 1068, 1072 (9th Cir. 2010) ("HALLEX does not impose judicially enforceable duties on either the ALJ or this court.") (internal citations omitted).

[150] Docket 13 at 4.

[151] SSR 13-2p, *available at* 2013 WL 603764.  *See also* 20 C.F.R. §402.35(b)(1); *Bray v. Comm'r of Soc. Sec. Admin.,* 554 F.3d 1219, 1224 (9th Cir. 2009) ("SSRs do not carry the 'force of law,' but they are binding on ALJs nonetheless.").

[152] *Kathleen v. Saul,* Civ. No. 3:19-cv-00651-JLS-RNB, 2020 WL 353602, at *8 (S.D. Cal. Jan. 21, 2020) ("As Plaintiff does not claim the ALJ improperly applied the Plaintiff's drug or alcohol dependence in his disability determination, SSR 13-2p is not binding.") (citing *Martinez v. Colvin,* Civ. No. 6:14-cv-01703-MC, 2016 WL 270911, at *5 (D. Or. Jan. 20, 2016) ("Plaintiff made no claims that there were misinterpretations of policies relating to drug addiction and alcoholism in this case.  Therefore, SSR 13-2p is inapplicable here and does not change this Court's application of *Lockwood*."); *Hollen v. Comm'r of Soc. Sec.,* 2017 WL 1075194, at *8-*9 (S.D. Cal. Mar. 22,

---

even after SSR 13-2p was enacted, the Ninth Circuit has continued to hold that the SSA's internal policy manuals such as HALLEX do not give rise to legally enforceable rights.[153] Moreover, in very recent decisions, district courts in the Ninth Circuit have also continued to hold that the HALLEX is not binding on ALJs and is not legally enforceable by federal courts.[154]

While the Court agrees that medical experts should not present their testimony before a claimant testifies, to the extent that constituted legal error in this case, it was harmless.[155]  Specifically, Plaintiff testified about his symptoms and daily activities, but did not introduce new medical evidence or sources and types of treatment that were not already in the record.[156]  And, as pointed out by the Commissioner, the ALJ's discounting of Plaintiff's symptom statements and limitations was not challenged by Plaintiff.[157]

In this case, a remand is not warranted based on the ALJ's alleged error in having the medical experts testify before Plaintiff testified.

---

2017) ("[A]s SSR 13-2p does not mandate the ALJ follow HALLEX procedures, the ALJ did not err by refusing to summarize Plaintiff's subjective testimony for the ME.").

[153] *See*, *e.g.*, *Wilson v. Berryhill*, 732 F. App'x 504, 507 (9th Cir. 2018); *Withrow v. Colvin*, 672 F. App'x 748, 749 (9th Cir. 2017); *Whitten v. Colvin*, 642 F. App'x 710, 713 (9th Cir. 2016); *Durden v. Colvin*, 546 F. App'x 690, 690-91 (9th Cir. 2013).  A court or litigant may cite to unpublished Ninth Circuit opinions issued on or after January 1, 2007.  U.S. Ct. App. 9th Cir. R. 36-3(b); Fed. R. App. P. 32.1(a).

[154] See *Elias v. Comm'r of Soc. Sec. Admin.*, Civ. No. 18-00200-TUC-RCC, 2019 WL 4296779, at *3 (D. Ariz. Sept. 11, 2019)("POMS is not binding on the ALJ."); *James v. Saul,* Civ. No. 19-cv-5881-KS, 2020 WL 3491565, at *10 (C.D. Cal., June 25, 2020) (HALLEX and POMS "are not binding on ALJs and are not legally enforceable by federal courts.").

[155] *McLeod v. Astrue*, 640 F.3d 881, 887 (9th Cir. 2011).

[156] A.R. 58–73.

[157] Docket 14 at 4.

B.  Medical Opinions

Plaintiff asserts that the ALJ failed to adequately consider all of the functional limitations in Dr. Lebeau's and DPT Baird's medical source opinions.[158]   The Commissioner contends that Plaintiff failed to show any harmful error in the ALJ's analysis of the medical source opinions under the new regulations regarding the evaluation of medical evidence.[159]   For claims filed on or after March 27, 2017, new Social Security Administration regulations apply.   In this case, Plaintiff applied for Title II benefits on or about October 22, 2017.[160]  The new regulations provide that an ALJ no longer gives "any specific evidentiary weight . . . to any medical opinion(s) . . ."[161]   The ALJ is required to consider, yet is under no obligation to articulate in the decision, how she considered all factors for all medical opinions and medical findings in the record.[162]  The factors the ALJ is to consider include supportability, consistency, relationship with the claimant (length of treatment, frequency of examinations, purpose of the treatment, extent of the treatment, and existence of an examination), specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding" (including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in

---

[158] Docket 13 at 6–11.

[159] Docket 14 at 4–9.

[160] A.R. 13, 218.

[161] *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844 (Jan. 18, 2017), *available at* 2017 WL 168819, at *5867–68; 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (for claims filed on or after March 27, 2017).

[162] 20 C.F.R.§ 404.1520c(b)(1); *see also Vincent ex rel. Vincent v. Heckler*, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (stating that ALJ "need not discuss all evidence presented").

the claim or an understanding of our disability program's policies and evidentiary requirements").[163]  Supportability and consistency are now considered the most important factors for evaluating persuasiveness[164] and the ALJ is required to explain how these factors were considered.[165]   Further, when two or more medical opinions or prior administrative medical findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must explain how "the other most persuasive factors" were considered.[166]

1.  *Dr. Lebeau*

Plaintiff asserts that the ALJ "ignored Dr. Lebeau's opinion that [Plaintiff] could only stand for 30 minutes at a time and only walk for 15 minutes at a time."  He also alleges that, although the ALJ adopted Dr. Lebeau's opinion that Plaintiff could stand/walk three hours total per day, the ALJ did not include this additional limitation in the RFC; nor did

---

[163] 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5) (for claims filed on or after March 27, 2017).

[164] The regulations state, "The factors of supportability . . . and consistency . . . are the most important factors [the SSA] consider[s] when [the SSA] determine[s] how persuasive [the SSA] find[s] a medical source's medical opinions or prior administrative medical findings to be."  20 C.F.R. § 404.1520c(b)(2) (for claims filed on or after March 27, 2017).

[165] C.F.R. § 404.1520c(b)(2) (for claims filed on or after March 27, 2017).  Supportability and consistency are explained as follows in the regulations:

(1)  *Supportability.*  The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2)  *Consistency.*  The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.  20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

[166] 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (for claims filed on or after March 27, 2017).

the ALJ provide this limitation to the vocational expert. Further, Plaintiff alleges that the ALJ ignored Dr. Lebeau's opinion regarding postural limitations. Specifically, Plaintiff notes that Dr. Lebeau initially testified that Plaintiff could stoop, kneel, crouch, and crawl occasionally, but later Dr. Lebeau testified that Plaintiff could not perform those activities up to 1/3 of the day. He argues that this error was not harmless as the vocational expert testified that Plaintiff could perform past relevant light work and other jobs performed at the light exertional level.[167] The Commissioner argues that any failure to include all of the functional limitations described by Dr. Lebeau was harmless. Specifically, the Commissioner points out that Plaintiff's past work as a basic logistics officer was a sedentary position as generally performed and that Plaintiff could have returned to this job.[168]

A court should affirm an ALJ's determination of a claimant's RFC "if the ALJ applied the proper legal standard and his decision is supported by substantial evidence."[169] In assessing an RFC, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"[170] It is "proper for an ALJ to limit a hypothetical to those impairments that are supported by substantial evidence in the record."[171] But "an RFC that fails to take into account a claimant's limitations is

---

[167] Docket 13 at 7–9.

[168] Docket 14 at 7.

[169] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005) (citing *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999)).

[170] *See* SSR 96-08p, *available at* 1996 WL 374184 at *5; 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'").

[171] *Osenbrock v. Apfel,* 240 F.3d 1157, 1165 (9th Cir. 2001) (citing *Magallanes v. Bowen,* 881 F.2d

defective."[172]  When posing a hypothetical question to a VE, the ALJ's "depiction of the claimant's disability must be accurate, detailed, and supported by the medical record."[173] And, "hypothetical questions asked of the vocational expert must 'set out all of the claimant's impairments.'"[174]

### a. Walking and Standing Limitation

Here, the ALJ determined Plaintiff could perform "light work" with limitations.  The ALJ incorporated into the hypothetical Dr. Lebeau's opinion that Plaintiff could stand or walk for a total of three hours in an eight-hour workday.  But the hypothetical did not include the additional limitations testified to by Dr. Lebeau that Plaintiff would be limited to standing 30 minutes at a time and walking 15 minutes at a time.[175]  Instead, the ALJ noted Dr. Lebeau testified that Plaintiff was likely capable of more than three hours of standing and walking.[176]

The new regulations require an ALJ to articulate how she considered the medical opinions.  However, the new regulations specify, "[the ALJ is] not required to articulate

---

747, 756-57 (9th Cir. 1989) ("The ALJ was free to accept . . . that the claimant's depression was mild and would not significantly interfere with the performance of work related activities.")).

[172] *Valentine v. Comm'r Soc. Sec. Admin*., 574 F.3d 685, 690 (9th Cir. 2009).

[173] *Tackett v. Apfel,* 180 F.3d 1094, 1101 (9th Cir. 1999).

[174] *Lewis v. Apfel,* 236 F.3d 503, 517 (9th Cir.  2001) (internal citation omitted).

[175] A.R. 17.

[176] Dr. Lebeau stated, "So, I'm going to say standing half an hour and two hours in the course of the day.  Walking, 15 minutes, and an hour in the course of the day.  And I think that's very generous.  I think [Plaintiff] certainly could be better than that, but I just don't have the evidence." A.R. 51.

how [the ALJ] considered each medical opinion or prior administrative medical finding from one medical source individually."[177]

The ALJ cited to objective evidence in the record to support the standing and walking limitations in the RFC. The ALJ referenced a September 2017 examination, at which Plaintiff stated that he walked three to four days a week "for a couple of hours." The ALJ also noted that Plaintiff reported lifting and pushing at his job, and pulling up to 700 pounds at a time at work since 2011.[178] The ALJ also cited to Plaintiff's physical examinations in 2018 that showed 5/5 strength in the lower extremities; a normal gait and stance; and the ability to stand without difficulty.[179] And other evidence in the record supports the ALJ's RFC: After hip surgery in early 2019, Plaintiff reported wearing a brace and using crutches, but he had "no other concerns";[180] approximately one month later, Plaintiff's provider opined that Plaintiff was "doing well overall" after hip surgery.[181]

In this case, the ALJ included in the RFC the walking and standing limitations of the medical providers that she found persuasive and supported by objective evidence in the record; by extension, these limitations were included in the hypothetical questions posed to the vocational expert.[182] Substantial evidence supports the ALJ's walking and standing limitations.

---

[177] 20 C.F.R. § 404.1520c(a)–(b)(1) (effective March 27, 2017).

[178] A.R. 19; A.R. 756.

[179] A.R 19-20; A.R. 432–33, 439, 786, 867, 1093, 1146.

[180] A.R. 1522.

[181] A.R. 1454.

[182] *Osenbrock v. Apfel,* 240 F.3d 1157, 1163–65 (9th Cir. 2001) (Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the hypothetical

### b. Lifting and Carrying Limitation

Plaintiff also argues that "[t]o say that Plaintiff can lift and carry 10 pounds *frequently* (the definition of light work), while standing/walking for 3 hours in an 8 hour work day, is both internally inconsistent and a direct contradiction of Agency policy."[183] Social Security Ruling (SSR) 83-10 states that light work generally involves standing or walking off and on for a total of approximately six hours in an eight-hour workday and that this amount of standing and walking is the primary difference between light and sedentary work.[184] By contrast, the regulations define sedentary jobs as ones that involve sitting, but also require occasional walking and standing.[185] SSR 83-10 further clarifies that "the total amount of standing and walking involved in sedentary work should not exceed about two hours of an eight-hour day."[186]

Here, the ALJ found Dr. LeBeau's opinion "very persuasive" that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently, which constitutes

---

question posed to the VE.).

[183] Docket 13 at 8.

[184] Social Security Ruling 83-10 describes "light" exertional levels as:

> [A] job is in [the light] category when it requires as good deal of walking or standing — the primary difference between sedentary and most light jobs.
> . . .
> [T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. By contrast, to perform the sedentary level of exertion, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." SSR 83-10, *available at* 1983 WL 31251, at *5.

[185] 20 C.F.R. § 404.1567(a).

[186] SSR 83-10, *available at* 1983 WL 31251, at *5.

light work.[187]  Plaintiff asserts this level of lifting cannot be harmonized with the three hour walking/standing limitation that places Plaintiff closer to the sedentary exertional level.[188]

Social Security Ruling 83-12 provides instructions for choosing proper Grid rules when a claimant's exertional level falls between two classifications.[189]  The ALJ should consult a vocational expert when "the individual's limitations are somewhere in the middle."[190]  In this case, the VE testified that Plaintiff could perform his past work as a basics logistics officer (DOT 184.117-050, sedentary, SVP 8) and shipping/receiving supervisor (DOT 222.137-030, light, SVP 6).  The VE specifically noted that based on Plaintiff's years in the military and training in college, Plaintiff was still capable of the highly skilled work involved with the basics logistics officer position.[191]  The VE also testified that, in the event the ALJ found that the basics logistics officer and shipping/receiving supervisor positions were not relevant past work, Plaintiff could perform the light duty jobs of small parts assembler, ticket taker, and parking lot attendant.  The VE testified that all three of the named light duty jobs would accommodate the three-hour standing/walking limitation.  He added, as actually performed, "[t]hese are [   ] jobs that you could sit or

---

[187] A.R. 21.

[188] A.R. 17; *see* SSR 83-10, at *5.

[189] The stated purpose of SSR 83-12 is "[t]o clarify policies applicable in using the numbered table rules in Appendix 2 of Subpart P (the 'Grids') of the regulations as a framework for adjudicating claims in which an individual has only exertional limitations, and no specific rule applies because the individual's residual functional capacity does not coincide with any one of the defined exertional ranges of work."  VE assistance is advisable when Plaintiff's exertional limitations are "somewhere in the middle" of the regulatory criteria.  SSR 83-12, *available at* 1983 WL 31253, at *3.

[190] SSR 83-12(2)(c), at *3.

[191] A.R. 74.

stand, parking lot attendants usually sit in a booth. Ticket takers . . . can sit, take tickets as well as stand, and small par[t]s assembly can sit or stand, either one."[192]

In sum, the ALJ adequately resolved the inconsistency between Plaintiff's RFC and the light work exertional category. The ALJ called a vocational expert to clarify the jobs Plaintiff would be capable of performing with his three-hour walking/standing limitation, pursuant to SSR 83-12.[193] The VE appropriately identified Plaintiff's past work and jobs in the national economy that a person with Plaintiff's limitations could perform.

### c. Positional Limitations

The ALJ included stooping, kneeling, crouching, and crawling occasionally in the RFC.[194] Dr. Lebeau testified,

> Stoop, kneel, crouch, and crawl, I would say occasionally and hoping that it would not actually be up to a third of the day. I . . . just don't know that that hip could handle that. But it's not that [Plaintiff] can't do these activities. . . It's just . . . limited.[195]

"Occasional" is defined as doing an activity from very little up to 1/3 of the time.[196] Pursuant to SSR 83-14, "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally."[197] Although Dr. Lebeau's testimony was somewhat ambiguous

---

[192] A.R. 78.

[193] SSR 83-12, *available at* 1983 WL 31253; *see also Moore v. Apfel,* 216 F.3d 864, 870–71 (9th Cir. 2000) (When a claimant falls between two grids, consultation with a VE is appropriate).

[194] A.R. 17.

[195] A.R. 52.

[196] SSR 83-10,

[197] SSR 83-14, *available at* 1983 WL 31254.

regarding Plaintiff's postural activities, "[w]here evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which must be upheld."[198] In this case, the ALJ's interpretation of Dr. Lebeau's testimony as limiting Plaintiff's stooping, kneeling, crouching, and crawling activities to the occasional level was reasonable and supported by substantial evidence. The ALJ summarized the medical records, and noted "numerous physical exams [that] revealed little or o sign of functional impact" caused by Plaintiff's impairments.[199] The medical records contain numerous entries at which Plaintiff's motor strength in the lower extremities was 5/5; he could rise from a seated position easily; and stand and walk without difficulty.[200] Substantial evidence in the record supports the ALJ's postural limitations in the RFC.

### d. Harmless Error

Finally, even if the ALJ erred by failing to include the "at a time" standing/walking limitations, or erroneously failed to limit Plaintiff's stooping, kneeling, crouching, and crawling or postural limitations, such errors were harmless in this case.[201] Rectifying each of these alleged errors would not have altered the ALJ's determination that Plaintiff was

---

[198] *Gallant v. Heckler,* 753 F.2d 1450, 1453 (9th Cir. 1984).

[199] A.R. 19.

[200] *See e.g.,* A.R. 316, 318, 323, 338, 432–33, 439, 522, 786, 852, 864, 908, 942, 1011, 1146, 1171–72, 1480, 1528.

[201] *Stubbs-Danielson v. Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008); *see also* SSR 96-9p, *available at* 1996 WL 374185, at *7–8 ("Postural limitations or restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually erode the occupational base for a full range of unskilled sedentary work significantly because those activities are not usually required in sedentary work" . . . "An ability to stoop occasionally, i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations.").

capable of performing sedentary work and returning to his previous job as a logistics advisor (DOT 184.167–094) at step four of the ALJ's analysis.[202]  Further, substantial evidence supports the ALJ's finding that Plaintiff was not disabled because other substantial gainful work consistent with the limitations in the RFC exists in the national economy.[203]

### 2. PT Baird

Plaintiff alleges that the ALJ ignored PT Baird's opinion that Plaintiff was only able to perform sedentary work with "some abilities into the Light and Medium range" and ignored the frequent postural changes and positional limitations, including stooping, squatting, and sustained neck positioning, described in DPT Baird's functional capacity evaluation.[204]  The Commissioner contends that the ALJ reasonably rejected of the portion of DPT Baird's opinion regarding frequent postural changes based on "evidence that [Plaintiff] offered less than full effort on examination."[205]

The ALJ found DPT Baird's opinion that Plaintiff was capable of sedentary work with "some abilities in the light and medium range" persuasive, concluding that it accurately reflected DPT Baird's testing and observation of Plaintiff overall and was

---

[202] A.R. 22, 77.

[203] 20 C.F.R. §404.1560(c) (The SSA is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience of the claimant.).

[204] Plaintiff argues that "during the FCE, [Plaintiff] demonstrated the ability to tolerate only 5 minutes of very mild stooping and reported pain on crouching.")  *See* Docket 13 at 10–11 (citing A.R. 792).

[205] Docket 14 at 8.

consistent with Dr. Lebeau's opinion.[206]  The ALJ did not ignore this portion of DPT Baird's opinion and included it in the RFC.  But the ALJ considered and rejected DPT Baird's opinion that Plaintiff required frequent postural changes and included only "normal breaks" in the RFC.[207]  The ALJ did not specifically address DPT Baird's comment in the FCE that "[p]ositional limitations were demonstrated in stooping, squatting, and sustained neck positioning."[208]

As set forth above, the ALJ adequately considered the factors in the new SSA regulations.  Her rejection of the frequent postural changes in DPT Baird's opinion was supported by the record.[209]  Further, DPT Baird's postural change opinion was more akin to a recommendation that Plaintiff would be "best suited for a job that allows for frequent postural changes" based on her observations during the evaluation, at which she also observed "variable levels of physical effort" during testing.[210]  Again, the ALJ included all of the limitations she found persuasive and supported by objective medical evidence in the RFC and by extension, the hypothetical questions posed to the vocational expert.[211]  Although DPT Baird noted that Plaintiff demonstrated position limitations, she did not

---

[206] A.R. 22.

[207] A.R. 17, 22.

[208] A.R. 792.

[209] *See e.g.,* A.R. 316, 318, 323, 338, 371, 432–33, 439, 514, 522, 786, 852, 864, 908, 942, 1011, 1146, 1171–72, 1480, 1528.

[210] A.R. 790–91, 793.

[211] *Osenbrock v. Apfel,* 240 F.3d 1157, 1163–65 (9th Cir. 2001) (Only limitations supported by substantial evidence must be incorporated into the RFC and, by extension, the hypothetical question posed to the VE.).

opine as to the resulting impact on Plaintiff's functional capacity.[212]  As set forth above, the ALJ's determination that Plaintiff was capable of stooping, kneeling, crouching, and crawling activities at the occasional level was reasonable and supported by substantial evidence.[213]  Moreover, as with Dr. Lebeau, any error in rejecting DPT Baird's opinion regarding postural changes or positional limitations was harmless as DPT Baird opined that Plaintiff "demonstrate[d] a full Sedentary capacity."[214]  Plaintiff's past work performed at the sedentary level would include very limited walking and standing and very limited stooping, kneeling, crouching, or crawling activities.[215]

## V.  ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations were free from legal error and supported by substantial evidence in the record.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 13 is DENIED as set forth herein and the Commissioner's final decision is AFFIRMED.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 6th day of April 2021 at Anchorage, Alaska.


*/s/  Sharon  L.  Gleason*
UNITED STATES DISTRICT JUDGE

---

[212] A.R. 792.

[213] *See e.g.,* A.R. 316, 318, 323, 338, 371, 432–33, 439, 514, 522, 786, 852, 864, 908, 942, 1011, 1146, 1171–72, 1480, 1528.

[214] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[215] A.R. 22; *see also* SSR 96-9p, *available at* 1996 WL 374185, at *7–8